Wissmath Packing Company, Appellee, v. Mississippi River Power Company, Appellant.

MORTGAGES: Redemption—Nature of Right to Redeem—Damages
1 Subsequent to Sale—By Whom Recovered. The *right* to redeem

property from foreclosure sale, though a *right* possessing value, is not property in, of and by itself, but is a part of, inseparably connected with, and that which necessarily follows, the ownership of the physical property to which it relates. It follows that a physical act which injures this *right* is, primarily and essentially, an injury to the property to which the right relates. It follows further that, when this injury occurs *after* foreclosure sale and *before* the expiration of the period of redemption, the damages resulting are wholly lost to the mortgagor *who fails to redeem.* Section 4065, Code, 1897.

PRINCIPLE APPLIED: The following facts were conceded or assumed, *arguendo*, to be true. Plaintiff, a corporation, owned a mortgage-encumbered packing plant on the Mississippi River. The mortgage was foreclosed and the property sold. Plaintiff was financially embarrassed, and, by reason thereof, was wholly unable to redeem from the sale. Plaintiff interested one S. in the plant, and S. promised to loan funds sufficient to effect redemption. Some time prior to this, defendant, under a Federal act requiring compensation to be made for "lands or other property taken, overflowed or otherwise damaged," built a dam across said river at a point some miles below said packing plant. This construction caused a change in the water levels, and, *after* said mortgage had been foreclosed and the property sold, and *before* the period for redemption had expired, the said change in water levels caused the water (unintentionally on the part of defendant) to back through the sewers leading from said packing plant, and to flood, for a few weeks, some of the cellars of the plant. Said S. visited the plant, while it was in this condition, and, on discovering the flooded condition of the cellars, and by reason thereof, he refused to loan the funds sufficient to effect redemption. The result was that plaintiff was unable to redeem, and lost the plant. Before the period for redemption had expired, plaintiff brought action against defendant, on the theory: (a) That defendant had damaged his *right* to redeem, to the extent of some $90,000, being the difference between the amount of the encumbrance and the value of the plant; (b) that this damage was "other property," within the meaning of said Federal act; and (c) that this damage was separate and distinct from any damage to the packing plant, and, consequently, was recoverable by plaintiff, and not by the deed holder under the foreclosure sale.

*Held,* the injury or damage to the *right* to redeem was essentially and necessarily an injury or damage to the *plant* it-

self, and the defendant was liable for the proximate damages to the plant by reason of the flooding.

*Held*, the damages, being an injury to the plant, were, under no condition, recoverable by the mortgagor *because he made no redemption*.

*Held*, plaintiff might not plead its own financial distress as an element of its cause of action.

*Held*, plaintiff's financial distress, and not the flooding of the cellars, was the proximate cause of the loss of the plant.

*Held*, the damages sought to be recovered by plaintiff were remote, speculative, and not proximate.

MORTGAGES: Redemption—Right to Redeem—Inherent Nature of Right. An injury to the *right* to redeem mortgage-foreclosed property is essentially and necessarily an injury to the physical property itself.

PRINCIPLE APPLIED: See No. 1.

MORTGAGES: Foreclosure—Sale—Subsequent Damage to Property —Who Entitled to Damages. Damages occurring to property after foreclosure of mortgage thereon, and prior to the expiration of the period for redemption, may not be recovered by the mortgagor *who fails to redeem*. Section 4065, Code, 1897.

PRINCIPLE APPLIED: See No. 1.

EMINENT DOMAIN: Compensation—Present and Future Damages Included. Principle recognized that damages to private property by public improvement are assessed once for all, and include all damages sustained, present or future, by reason of a proper use and maintenance of such improvement.

ACTIONS: Cause of Action—Nature—Financial Distress as Element —Corporations. One may not, in an action for damages for an *unintentional* injury, plead his own financial weakness or distress as an element of his cause of action. *And especially is this true of a corporation.*

PRINCIPLE APPLIED: See No. 1.

DAMAGES: Speculative Damages—Injury to Right of Redemption. Remote, speculative and non-proximate damages are not recoverable. So held where plaintiff, a mortgagor of property, was, by reason of his own financial distress, unable to redeem, and sought to hold defendant in damages for unintentionally injuring the property to such an extent that plaintiff was prevented from securing a loan sufficient to effect redemption.

PRINCIPLE APPLIED: See No. 1.

DAMAGES: Proximate Cause—Flooding of Mortgage-foreclosed
7 Property—Redemption Prevented. Principle recognized that
the proximate cause of an injury or damage is that cause
which is the *nearest, most direct,* and *immediate* cause, and
without which the injury or damage would not have occurred.
PRINCIPLE APPLIED: See No. 1.

*Appeal from Lee District Court.*—W. S. HAMILTON, Judge.

WEDNESDAY, MAY 16, 1917.

ACTION for damages for alleged injuries to a right of redemption in certain real estate. There was a general denial by the defendant. The jury rendered a verdict for plaintiff for $53,000, and the defendant appeals.—*Reversed.*

James C. Davis, George B. Stewart and J. O. Boyd, for appellant.

E. C. Weber, A. J. Wissmath and J. R. Frailey, for appellee.

EVANS, J.—The case presented by the
1. MORTGAGES: plaintiff is unique. The plaintiff is a Mis-
redemption:
nature of right souri corporation, and the defendant, a
to redeem:
damages sub- Maine corporation. The defendant con-
sequent to sale:
by whom re- structed the public improvement popularly
covered.
known as the "Keokuk Dam." This im-
provement was constructed by defendant under authority
of an act of Congress, which imposed, however, upon the de-
fendant the obligation to make compensation to all persons
whose property might be taken or damaged by the con-
struction and maintenance of such improvement, in accord-
ance with the laws of the state where such property might
be situated, the improvement in question extending across
the Mississippi River, and being, therefore, situated partly
in Iowa and partly in Illinois.

The plaintiff was the owner of a certain packing plant
located at Fort Madison, near the Mississippi River and
about 25 miles above the dam. This plant was encumbered

by two mortgages, and these mortgages had been foreclosed and an execution sale had thereunder prior to the injuries complained of. Judgments of foreclosure had been entered for something more than $56,000. Execution sale was had on December 14, 1912, and the property was bid in for the amount of the judgments.

The injuries complained of by plaintiff first occurred on June 20, 1913, and continued for a period of 6 or 8 weeks. The plaintiff had as a part of its plant eight cellars, 8 or 10 feet deep. These communicated with sewers. The claim is that, into three of these cellars, the water backed through the sewers to a depth of 5 or 6 inches, and that this condition continued for said period. It is claimed also that this was caused by the raising of the level of the river, which resulted from the maintenance of the dam. The defendant denies that such was the cause of the presence of the water, and the record of the government gauges shows that at no time in 1913 did the river rise high enough to enable the water therefrom to enter the sewers in question. But whatever the cause, it is undisputed that it was entirely remedied within the period indicated, and that no water has ever since appeared in such cellars. The claim of plaintiff is not for damages done to the plant. But it claims that because of the flooding of such cellars the value of the plant was depreciated, and that it was for that reason unable to redeem it from execution sale, and unable to interest other parties in a purchase or lease of the same. Paragraph 10 of its petition is as follows:

"That, due to defendant's failure to properly protect said plant, water was, during the period of redemption, backed up in plaintiff's cellars, and that it was known to defendant. that, if said property was not protected, that the same would be flooded and the property become useless for its intended purpose and would depreciate in value, and that said property during the period of redemption be-

came useless for its intended purposes and could not, by reason of the acts hereinbefore set forth, be operated as a packing plant, and depreciated in value to such an extent that plaintiff was unable to redeem the property and was unable to interest parties to purchase said plant or to lease the same, or to put the same in operation as a packing plant, and that, by reason of the acts herein set forth, plaintiff lost his right of redemption, and has been damaged in the sum of $93,500."

The plaintiff introduced evidence to the effect that the plant was worth $150,000; that it was under lease for a term of two years from May 15, 1912, to one Schaper; that, in January, 1913, Schaper promised to furnish the money necessary to make redemption from the execution sale; that, in March or April, 1913, Schaper ceased the operation of the plant, and the same has never since been operated; that, in August, 1913, Schaper refused to furnish the money for the purpose of redemption; that the reason for such refusal was that he had seen the water in the cellars and was influenced thereby to refuse the loan. The record shows also that this suit was begun on November 22, 1913, while the right of redemption still subsisted. The contention in argument for the defendant is that the damages here claimed were remote and speculative; that the facts upon which plaintiff purports to found such claim for damages were not proven; that the verdict, on any theory, was grossly excessive.

In support of defendant's contention, there was evidence to the effect that the plant was of comparatively little value; that it was out of date, having been built more than 25 years ago; that its operation was attempted by many persons successively, and that none ever attained any success therein; that the plant was idle for many years; that it was purchased by the plaintiff in 1909 for $10,000; that it was operated for 2 or 3 years by the plaintiff very unsuccessfully, and was finally mortgaged, as already

stated, for the payment of existing debts; that it was then leased to Schaper for a rental of 40 per cent of the profits; that the president of the company became an employee of Schaper's in the operation of the same; that there were no profits from the operation thereof by Schaper and that, therefore, no rent was earned; that Schaper abandoned the use of the property entirely long prior to June 20, 1913; that no interest, taxes or insurance was paid by the plaintiff after the execution of the mortgages under which execution sale was later had; that the immediate cause of the abandonment of the use by Schaper was undisputedly that certain improvements were required by the Federal inspector which would require an expenditure of $300 or $400, which expenditure both Schaper and the plaintiff refused to make; that, after the promise made by Schaper in January, 1913, to make the redemption, the subject was not again mentioned until August, although the parties worked together daily; that, if Schaper promised to make such redemption in January and in good faith intended to make the same, no reason is made to appear why it should not have been done forthwith; that the promise by Schaper contemplated the purchase by him of the plant for the amount of the debt and the furnishing of employment by him to the president of the company in the operation of the same; that the later abandonment of the use of the plant by Schaper and the reasons given by him therefor were contradictory to any intention of further operation of the plant or the purchase thereof; and that the conduct of Wissmath, president and manager of the plaintiff corporation, was inconsistent with any intention on his part to redeem from the execution sale. The foregoing will indicate the general scope of the issues and the general nature of the evidence.

Speaking negatively, the plaintiff does not predicate its claim of liability against the defendant upon any wrong-

ful act of the defendant's. On the contrary, all that was
done by the defendant was admittedly done under the au-
thority of the act of Congress hereinbefore referred to.
Nor does plaintiff claim damages for any alleged perma-
nent injuries to the real estate, nor for any physical injury
thereto, either temporary or permanent, because such dam-
ages would admittedly accrue under our statute to the pur-
chaser at execution sale, if redemption from such sale were
not made. Nor does the plaintiff claim damages for any
interference with the use or possession of the premises dur-
ing the year of redemption, because such damages, if any,
would accrue to the tenant. Nor does the plaintiff claim
that the alleged depreciation in value resulted from any
injury thereto which affected its general market value. The
last analysis of its claim is that it had a right of redemp-
tion of the property; that it was financially unable to exer-
cise that right; that Schaper would have loaned it sufficient
money for the purpose of redemption if he had not seen the
water in the cellar; that the presence of the water in the
cellar, therefore, was an injury to its right of redemption,
in that it operated as an interference with Schaper's con-
tract to loan the money. The case was submitted, there-
fore, to the jury upon the theory that the extent of the in-
jury to the real estate and the extent of the depreciation
of market value resulting therefrom were each immaterial;
that, if the presence of the water was the sole cause of
the failure of the plaintiff to obtain a loan sufficient to make
redemption, then the plaintiff was entitled to recover the
difference between the value of the property prior to June
20, 1913, and the amount of the bid at execution sale, and
this regardless of the extent of damage to the property it-
self. In other words, the damage and the cause thereof
were wholly psychological, and this psychological cause was
confined in its operation wholly to its effect upon the mind
of one man, Schaper. The testimony in support of the con-

tract for a loan and the failure thereof was given by the president of the plaintiff company as a witness and by Schaper, and the same was as follows, omitting all objections:

"Wissmath: Before Mr. Schaper quit the building as a tenant, I will ask you to state whether or not you had a talk with him about redeeming the property or making a loan to the Wissmath Packing Company so that the Wissmath Packing Company could redeem it? A. Yes, sir. Q. And when was this? A. The latter part of January, 1913. Q. What was that conversation, as near as you can give it? Q. You may state whether or not, during the latter part of January, 1913, you asked Mr. F. C. Schaper to let you, or the Wissmath Packing Company, have a sufficient amount of money so that you could redeem or pay off the German American Bank of St. Louis. A. Yes, sir, I asked Mr. Schaper. Q. Now, I will ask you to state whether you had another conversation with Mr. Schaper about furnishing the money, and when that was? A. Yes, sir, I did. That was the latter part of July or first of August, 1913. Q. What did you say to him then about furnishing the money? A. I asked him whether he was ready to furnish that money. Q. Now were you successful in obtaining at this second conversation from Mr. Schaper the money? A. No, sir."

"Schaper: You may state whether or not Charles Wissmath ever came to you and spoke to you about furnishing money with which to redeem the plant. A. He did. This talk was in the fore part of January, 1913. Q. What, if anything, did he say to you? A. He wanted to know if I could furnish the money sufficient to redeem the plant. Q. What, if anything, did you say about doing so? A. I said I could. Q. State whether or not you told him you would furnish a sufficient amount. A. I said I would, after due consideration. I knew the amount necessary to redeem. It was $56,000. Q. State whether or

not you had sufficient funds so that you could have furnished that amount. A. Yes, I left the premises about the first of June, 1913. Q. Do you know whether or not they had raised the Santa Fe shops, or were raising them? A. They were raising the roundhouse and had started to raise the tracks north of the packing plant. Q. Now, about how much lower were the cellars of the plant than the tracks they were raising? A. I would have to judge about 8 feet. When I left that plant, it was in a condition to be operated as a packing plant. After I left the plant, I went down there again and into the cellars. I didn't see anything different until the latter part of June, 1913, I found there was water in the cellar. I know a low place that has been dug out in the hide cellar. Up to the time I left, there was no water in it. I saw water in there the latter part of June. The pit was not concreted; just a hole dug out in the ground. I don't think at this time there was an embankment built at the south of the plant. Q. Now, did you ever have another talk with Mr. Wissmath about redeeming that plant? A. He came to me early in August and asked me whether I had changed my mind about furnishing the money to redeem the plant. Q. What did you say to him then? A. Under the conditions, I wouldn't furnish it—would not put any money in the plant. Q. Now, what were the conditions, Mr. Schaper, that made you change your mind about furnishing the money? A. I saw the condition of the cellar, the water in it, and I noticed they were building a dyke with the intention of protecting the plant. I don't know just when it was they placed pumps down near the dyke. I cannot say whether they had a pump before that time to take the water out of the cellar. The dyke had not been built at that time. Q. Was there, at the time you refused Mr. Wissmath the money with which to redeem, any protection placed around the plant by the water power company? A. No, sir. Q.

State whether or not if the physical condition, if no water had been backed into the cellars and the river had not been raised, the tracks and shops adjacent had not been raised, and no preparations made to build a dyke, if then and in that case you would have furnished sufficient money to Charles Wissmath with which to redeem the plant. A. Yes. Q. Now, Mr. Schaper, if the physical conditions of the plant had remained the same as they were up to the time you quit operating, you may state whether you would have furnished Mr. Wissmath the money with which to redeem. A. Yes. Q. Mr. Schaper, are you acquainted with the reasonable market value of what is known as the Wissmath Packing Plant in the city of Fort Madison, Iowa, just before the water came into the cellars, as it did,—back up in the sewers, as it did? A. I think I know what it would have been worth to me. Q. Are you acquainted with the reasonable market value of what is known as the Wissmath Packing Plant in the city of Fort Madison, Iowa, as a packing plant, just before the water, if any, came into the cellars? A. Yes, sir. Q. What was the reasonable market value? A. About $150,000."

"Cross-Examination.

"My lease was for a period of two years. The lease provided for 40 per cent of the net profits as the rental of the plant. I never paid the company any rent under this lease because there was no profit. I operated under the lease from May 15, 1912, until March 15, 1913. During that time there were no profits. I remember when the foreclosure proceedings commenced. The sale was December 19, 1912. I was not present at the sale. I knew it was coming off. I knew the mortgage amounted to $56,000, but did not attend the sale and try to bid on it. That was December, 1912, long before the Santa Fe raised any tracks or the roundhouse, long before the dyke was started, and long before any water was raised. Neither Mr. Wissmath

nor any member of the company ever spoke to me before the foreclosure about money to pay the interest on the mortgage. * * *. In January, Charles Wissmath talked to me about furnishing him money to redeem. I told him I could. I told him that in the fore part of January. I did not know anything about the judgment or the rate of interest it was bearing. There was nothing more said to me by Charles Wissmath about furnishing him money to redeem until the fore part of August. I was meeting him every day. He was working for me under a salary. After I told him in January that I would furnish him money to redeem, we let the matter drop until the fore part of August. I knew the interest was mounting up every day. The amount necessary to redeem was available. I did not have $56,000 in money in the bank at that time, nor did I have it in my personal possession. I did not see the Prairie Oil and Gas Company raising anything. The Prairie Oil and Gas Company looks 200 feet nearer to the river than the packing plant is. I finally abandoned the packing house premises the latter part of May, 1913. After that, there was no one there except a watchman, who was to keep the automatic sprinkler going. I do not know who paid him. The first water I found in any cellar was in the last part of June. I could only see water in three of the small cellars. They were the rooms of the lowest elevation. One of them was the tank room where the sewer outlet is. That is a small room with a wooden floor. In that room there were two wooden boxes that hold water. The main sewer outlet runs right into one of them. Water was usually kept standing in those wooden boxes. When the plant was in operation, there was always water in those boxes. We used a great deal of water in that room. There were wooden ways that run water down into these boxes. There was about six inches of water in that room at the foot of the stairs. I do not know where the water

came from.   I know that there is a 3-inch pipe that comes into the pump room, designated as Room 3 on Exhibit 13, that leads to and is connected with a larger pipe belonging to the Santa Fe water system.   There was a valve at the end of the pipe.   If the valve was open, I know of nothing to prevent all the water, under high pressure, from the Santa Fe system, from running into the cellar.   In the hide cellar, there is an excavation originally made for an elevator.   In the latter part of June, I saw some water in it.   The bottom of the hole is three feet lower than the floor of the hide cellar.   Q.   Mr. Schaper, in January, when Mr. Wissmath talked to you about the matter, the arrangement was, wasn't it, that you were to get the plant for the debt and give employment to Charles Wissmath, Jr.,—that was the arrangement then?   A.   Yes, sir.   Q.   After that, your next talk was in August, and you told him that you had changed your mind?   A.   Yes, sir.   Q.   Did he then offer to give you any additional security?   A.   No, sir. I saw no water in the cellar after the sewer was cut in August. I saw the water the latter part of June.   After the sewer was cut, water could not come back into the building.   At the time the sewer was cut, they had a pumping plant pumping the water out, and the cellars were dry.   I have been down there several times since June.   The last time I saw water there was in June, 1913, and I knew that they were going to build a dyke to protect the plant. * * * Just before I quit, the government inspector notified me that there would not be any more government inspection unless certain repairs were made.   The ones that he mentioned that time would have cost $200 or $300.   He verbally talked about cementing the floors of the hog pens. He said this would have to be done.   They were repairs that would have to be made if we wanted to kill and sell in interstate commerce.   He could stop our disposing of meat out of the state of Iowa.   I refused to make those re-

pairs. In January, I tried to get Mr. Wissmath to make them. I have been talking about the repairs he required in January. In March, he made other requirements. There were requirements pretty near every week. These were not complied with, and he went away. After that, we could not ship any meat in interstate commerce. The repairs would have cost $300 or $400. Neither Mr. Wissmath nor I were willing to put in $300 or $400 in repairs to keep on killing and shipping in interstate commerce. The inspector left, and the plant shut down."

Redirect examination: "In the January, 1913, conversation with Mr. Wissmath, he was to be employed by me and I was to have a trust deed or mortgage. Q. Mr. Stewart also asked you if you were willing to put up the money for the repairs necessary that the inspector requested, and you said 'No,' in answer to that question. Now, will you explain why? A. I had fully made up my mind to discontinue at that time."

The foregoing is all the evidence that was introduced to support the allegation that the presence of the water in the plaintiff's cellars was the sole cause of the failure to redeem. If we could accept the plaintiff's theory of liability as a legal proposition, we should find it difficult to say that such evidence was sufficient to support a jury finding of the fact to which it was directed. We pass, however, to a consideration of the soundness of plaintiff's general theory of liability of the defendant for the damages claimed.

1. The Act of Congress under which the defendant was authorized to construct the dam in question contained the following proviso:

"That compensation shall be made by the said Keokuk and Hamilton Water Power Company to all persons, firms, or corporations whose lands or other property may be taken, overflowed, or otherwise damaged by the construc-

tion, maintenance and operation of the said works in accordance with the laws of the state where such land or other property may be situated."

2. Mortgages :, redemption : right to redeem : inherent nature of right.

The parties are agreed that the laws of Iowa applicable to the Congressional Act are those pertaining to the condemnation of private property for public use. Our Constitution provides that private property may not be "taken" for public use without just compensation's first being made. The Congressional Act is somewhat broader in its terms, and provides for compensation to all persons "whose lands or other property may be taken, overflowed or otherwise damaged." That the defendant would be liable to any property owner for appropriate and proximate damages is conceded. Whether the basis of its liability rests theoretically upon contract or tort is not now material for our consideration. Possibly it could be made to rest on either one; upon contract, on the theory that its acceptance of the provisions of the Congressional Act was a contractual undertaking in behalf of all property owners affected; upon tort, on the theory that the possession of property "taken" should be deemed a continuing trespass until compensation be actually made. The plaintiff in its pleading appears to have adopted the first theory, and the trial court submitted the case on such theory, and we shall likewise adopt it. It is not claimed that the plaintiff's packing plant was "taken," within the meaning of the Iowa law, but it is claimed that it was damaged, within the meaning of the Congressional Act. The parties dispute in argument whether the plaintiff's so-called "right of redemption" was "other property," within the meaning of the Congressional Act. The plaintiff's theory of the case carves out of the fee simple estate the "right of redemption," as being plaintiff's distinctive and exclusive property. The defendant contends that such

"right of redemption" is not "land or other property," within the meaning of the Congressional Act. Defendant also contends that, under the rule of *ejusdem generis*, the term "other property" must be construed to refer to landed property; whereas the plaintiff contends that the "right of redemption" is an interest in real estate, and in any event is "property," and that the rule of *ejusdem generis* has no application. The packing plant was land. The plaintiff was the owner of it in fee simple. If the water damaged it, it was a damage to the land. The fact that the plaintiff had encumbered its title with a mortgage did not change its relation to the fee title. By the terms of the mortgage, it had a right to pay the debt and discharge the lien at any time. Independent of the terms of the mortgage, it had such a right as a matter of equity. This was its "right of redemption." This right would continue indefinitely until foreclosure sale and until one year thereafter. As a matter of terminology, the right of redemption *before* sale is often referred to as the *equitable* right of redemption, and the right *after* execution sale as the *statutory* right of redemption. Whether exercised before sale or after, the right of redemption is essentially the same. It is the right to discharge the lien by payment of the debt. The purchaser at execution sale holds a lien, and a lien only, until his right to a deed matures by the expiration of one year. The mortgagor holds his fee simple title for the same period. It was expressly so held in *Dolan v. Midland Blast Furnace Co.,* 126 Iowa 254, 256. The title of the mortgagor being thus complete, the "right of redemption" adds nothing to his title or estate, and carves nothing out of it. It follows that, if the cellars were flooded as a result of the maintenance of the dam, the resulting damages would be a damage to land, and the defendant would be liable therefor under the terms

of the Congressional Act. It would like-
wise follow that such liability would inure
to the exclusive benefit of the plaintiff,
were it not for the provisions of our statute
(Section 4065, Code, 1897), which provides
as follows:

3. MORTGAGES:
foreclosure:
sale: subse-
quent damage
to property:
who entitled to
damages.

"When real estate has been sold on execution, the
purchaser thereof, or any person who has succeeded to
his interest, may, after his estate becomes absolute, recover
damages for any injury to the property committed after
the sale and before the possession is delivered under the
conveyance."

The purpose and effect of this statute is to protect
the execution purchaser against intervening waste and
spoliation after he has bound himself by his bid and before
he has become entitled to take title or possession. If, before
the expiration of the statutory year of redemption, the
mortgagor shall redeem, then the claim of the execution
purchaser is fully discharged, and he has no further interest
in the question of waste or damages. In other words, the
statute subjects such a claim for damages to the same lien
as the land itself. If no redemption be made, then the ex-
ecution purchaser is entitled to demand all the property
upon which he placed his bid, or its equivalent in the form
of damages. In such event, the owner of the land, as mort-
gagor, loses the right to claim intervening damages in
the same way and at the same time that he loses his
land, viz., by the failure to redeem from the debt within
one year. If he does redeem, then both the land and the
claim for intervening damages continue to be his. Under
the statute, the claim for damages inures to the benefit of
both debtor and creditor. The claim of the creditor is par-
amount in the same sense that his lien is paramount to the
debtor's title. Such paramount right, however, is contin-
gent only, and is wholly subject to the will and act of the

debtor. In a legal sense, it is at all times within the power of the debtor to discharge the lien of the creditor, and thereby to protect both his title and his cause of action for damages. In this case there was no redemption. Under the statute, therefore, the title and ownership of the real estate and all intervening damages thereto vested in the execution purchaser. The interest of the debtor in both was wholly extinguished. Counsel for appellee have fully perceived the difficulty confronting them at this point. They therefore disclaim intent to claim damages for injury to the real estate or to the possession thereof. They contend, however, that their client's right of redemption was a valuable right, measured by the value of the property less the encumbrance, and that such right was an interest in real estate.

What we have already said indicates our view that the right of redemption is not an estate nor an interest in lands in any other sense than that it is a necessary incident of ownership, attaching to it and following it at all times. While the ownership continues, the right of redemption continues. When the ownership ceases, the right of redemption ceases likewise, of necessity. There can be no right of redemption without ownership, and ownership without a right of redemption would not be ownership. If the plaintiff suffered any damages from the flooding of the cellars, it was because it was the owner of the plant. How, then, can we avoid the effect of the statute above quoted, and fail to say that whatever damages were then suffered have gone the way of the ownership, to the execution purchaser? Conceding that a right of redemption has value, as contended, such value is precisely the same as the value of ownership subject to the encumbrance, and such was the measure of damage submitted by the court to the jury. If the value of the property had been totally extinguished by the injuries complained of, the measure of damage to the owner would have been precisely the

same as that adopted herein. The fact that the measure of damage for the loss of the entire property and that for the loss of right of redemption are identical, is of itself suggestive of the essential identity of the alleged causes of action themselves. Plaintiff places considerable reliance upon certain language used in the case of *Conway v. Sherman,* 78 Iowa 588. The holding in that case was adverse to the plaintiff therein, and therefore to the theory of the plaintiff herein. A directed verdict therein was sustained. In the discussion of the case, however, it was said that the measure of damage for loss of a right of redemption would be the value of the property less the encumbrance. It was not held therein that a cause of action would lie for the loss of a right of redemption, as distinguished from the damage to the property. It might be said, however, that this was the implication of the discussion. It should be borne in mind, however, that the discussion simply proceeded upon the assumption or theory of the plaintiff, and was pointing out additional defect or error. For the purpose of the discussion, the general theory of liability put forward by plaintiff therein was simply assumed. The question which is now before us was not passed on at all. All that can be claimed, therefore, by plaintiff now is that the measure of damage adopted in the case at bar was consistent with the *Conway* case. If we could sustain plaintiff's theory of liability, the measure of damages adopted would seem to follow logically.

4. EMINENT DO-
MAIN: compen-
sation: present
and future
damages in-
cluded.

Damages to private property by public improvement, when assessed, are assessed once for all, and include all damages sustained by the owner, present or future, by reason of a proper use and maintenance of the public improvement. *Hileman v. Chicago G. W. R. Co.,* 113 Iowa 591; *Richardson v. City of Centerville,* 137 Iowa 253, 255.

2. Turning to another phase of the case: Can it be said in any legal sense that the flooding of the cellars was the proximate cause of the plaintiff's loss of ownership of its plant or its loss of its right of redemption? The plaintiff puts forward as an element in its case its own financial inability to make redemption, except by obtaining credit from a third party by pledge of the property. Because of such financial inability, it was rendered dependent upon the mood and temper of such third party. The condition of the cellars being such as to dissuade such third party, the injury to the plaintiff, as contended, necessarily followed.

5. ACTIONS: cause of action: nature: financial distress as element: corporations.

In order to simplify the discussion, we will for a moment eliminate entirely the question of plaintiff's inability, and inquire into the legal status of the parties, regardless of such question. Suppose that Schaper, who is shown to have abundant means, had been the owner of the property, and therefore the owner of the right of redemption, could he have put forward the claim that the presence of the water in the cellar caused him to fear to exercise his right of redemption and that thereby he abandoned and lost the same; and could he have made such claim the basis of liability on the part of the defendant for having destroyed his right of redemption? Under the instructions of the trial court herein, he could not. The trial court instructed the jury that it was the duty of the plaintiff to redeem if it could, and to use all reasonable efforts to obtain the means to redeem, even though Schaper had refused to extend credit. Concededly, if the plaintiff had been financially able to redeem, it would have been required to redeem as a condition precedent to this action.

6. DAMAGES: speculative damages: injury to right of redemption.

If it had redeemed, it could have recovered

**7. Damages: proximate cause: flooding of mortgage-foreclosed property: redemption prevented.** from the defendant the actual damages sustained by the flooding of the cellars. It could not have recovered the value of its so-called "right of redemption." Manifestly, a recovery of the amount of damages actually inflicted upon the premises would be full justice. If such would be the limit of recovery to Schaper as owner and redemptioner, and if such would be the same limit of recovery to the plaintiff herein if it had redeemed, why should the financial inability of the plaintiff increase the liability of the defendant for the same act? The trial court instructed the jury that, in order to render a verdict for the plaintiff, it was not enough to show that the flooding of the cellars was a *contributing* cause to the loss of the right of redemption, but it must be shown that it was the *sole* cause. So far as appears in this case, the actual damage inflicted upon the property was nominal. How can it be said that such damage was the sole cause of the loss of the right of redemption by plaintiff, when its own financial inability to redeem is put forward as an essential element in its case? The record does not disclose what its actual financial condition was, nor the amount of its capital stock. It appears only in a general way that it was not able financially either to operate the plant or to make the redemption without the help of credit from Schaper. The plaintiff is a corporation. The amount of its capital stock was made great or small according to the wish of its promoters. Presumptively, it was made small—too small to conduct the business for which it was organized. Does that fact furnish reason why a different rule of law should obtain in its favor as regards damages inflicted upon its property? Can this fact be made an element of its case whereby a claim for damages, which would have been comparatively small if held by a corporation of adequate means, may be

multiplied many fold? What was done in this case was to hold the defendant liable for the full alleged value of the plant, less the encumbrance thereon. Why? Because the plaintiff was *unable* to redeem without the help of Schaper, and Schaper would not help because he had seen the water. We think it clear that the nature of defendant's liability for the flooding of the cellars was precisely the same whether the plaintiff's capital was large or small. The fact that such damage inured to the benefit of the execution purchaser was beyond the control of the defendant.

If the defendant had been guilty of some wrongful act directed against the plaintiff *because* of its actual condition, a different question would be presented. No wrongful act in causing the injury is charged against the defendant. Its liability is predicated upon the provisions of the Congressional Act; and the one wrong charged against it now is its failure to pay the damages. Under our statute, above quoted, the plaintiff was in no position to demand the damages until he had redeemed. Until redemption be made, the claim of the execution purchaser was superior. That fact appears to have been recognized by the plaintiff, and no demand for damages appears to have been made prior to the bringing of this suit. The authorities cited by the plaintiff at this point are cases of intentional and malicious interference by intermeddlers, with contracts between others. The rule put forward is that, where one intentionally and maliciously induces another to breach his contract, he thereby becomes a party to the breach himself, and is liable for damages. The defendant was guilty of no such act. If it had been, its liability could not be predicated upon the provisions of the Congressional Act. Such a wrong would not be a damage to property. If the defendant were guilty of interference with a contract, it could become liable only for such damages as flowed naturally and proximately from the breach. But an action for such damages would be strictly

·a personal action. The subject-matter thereof would be entirely foreign to the Congressional Act and to the condemnation statute. It is clear also that neither the pleadings nor the evidence present a case of meddling or interference with a contract on the part of the defendant; nor do they present a situation where the plaintiff may put forward its financial weakness as an element of its case. A state of facts which would warrant a consideration of a plaintiff's financial disability in his favor, is particularly pertinent to wrongs perpetrated upon a natural person rather than upon an artificial person. A natural person may be subjected to intentional and malicious injuries to which a mere corporation is not susceptible. A human being, though stripped of property, must still live on and bear the inevitable burdens of his life; wife and child must be sheltered and fed; daily obligations must be met; the grocer and the milkman must be paid; pride of character and sense of honor are his continuing goad. They command his energies, and hold him to a continuing service. His one resource is his earning capacity and his opportunity for employment. A wrongful interference with his contract of employment affords him a right of action for damages against the wrongdoer. An action for damages for interference with contracts has its particular pertinency to contracts of individual employment. In such a case, the financial condition of the complainant may become an important consideration. But this right of action and the right to put forward therein financial disability as an element of the case has little pertinency to a corporate plaintiff. The amount of the capital of a corporation is always a matter within the volition of its organizers and stockholders. By the same volition, it may be increased or decreased. If it be stripped of its capital, its function is finished. It does not seek employment and never becomes a wage earner. By force of its insolvency alone, it dies artificially. It is, there-

fore, not easily subjected to malicious wrongs, and is in no position to command the sympathy of the law for the paucity of its assets. The doctrine itself which the plaintiff invokes is one of the mercies which have engrafted themselves here and there upon the law and have bent its straight lines somewhat. Such doctrine is not wholly in accord with strict legal uniformity. But it is merciful in its nature, and finds its justification in the higher levels of equity, and perhaps in the ancient foundations of the law. "To do justly and to love mercy" is the Mosaic floor of the structure of our civilization. But mere mercy as such is a response not to artificial entities, but to flesh and blood in the struggle for life. For cases illustrative of the application of this doctrine, see *Hollenbeck v. Ristine,* 114 Iowa 358, 367; *Kock v. Burgess,* 167 Iowa 727; *Faunce v. Searles,* (Minn.) 142 N. W. 816; *Lucke v. Clothing Cutters' & Trimmers' Assembly,* (Md.) 19 L. R. A. 408. See, also citations in 8 R. C. L. 632, Sec. 174. We find no case where the doctrine has found application to an artificial person.

In this case, the capital of the plaintiff corporation was precisely what its organizers and stockholders made it. Their implied obligation to the public was to furnish and maintain it with sufficient capital to conduct the business for which it was organized. If the capital of the corporation was not sufficient to enable it to pay its debts and thereby to protect its property against execution sale, the loss of the property was the only ultimate alternative. There was no legal impediment to the increase of the capital up to the needs of the corporation. If it be true that the plant was worth twice as much as the judgment against it, it would seem to be the first requirement of business prudence to increase the capital stock sufficiently to enable the discharge of the debt. If the plaintiff was unable to redeem because of the shortage of capital, was not the shortage of capital the controlling and proximate cause of

the loss of the property? In any event, there is no room here for the application of the rule that financial disability may be a consideration in plaintiff's favor, and this is so even regardless of the corporate character of the plaintiff.

3. Taking the view most favorable to the plaintiff of the contract with Schaper and the alleged breach thereof, it was a promise to loan money. The nature of the contract was such that the breach of it left the parties as it found them. If the plaintiff had sued Schaper for the breach, it could have recovered nothing but nominal damages. It was expressly so held in *Thorp v. Bradley*, 75 Iowa 50. In the cited case, the defendant was alleged to have agreed to loan money for the purpose of enabling the plaintiff to redeem real estate, and to have breached such agreement, whereby the plaintiff lost his right of redemption. It was held that only nominal damages could be recovered. To the same effect is *Lamb v. Buker*, 34 Neb. 485, 488. If there could be no recovery against Schaper for the breach of such agreement, how could there be a recovery against the defendant for unintentionally causing such breach? The holding in the cited cases is that the damages claimed were remote and speculative, and not proximate. And such is the situation herein.

4. In view of the conclusion reached on other features of the case, it becomes unnecessary for us to consider the claim that the verdict was excessive, further than to announce our conclusion thereon. We think the verdict was shockingly excessive. We may say, also, that, if we were able to adopt the plaintiff's general theory of liability, we should have to say that the evidence was of very doubtful sufficiency. The evidence which we have set forth above is the main support of the verdict. The best that could be said for it is that it is a gossamer thread. It relates wholly to matters that are and were within the breast of the witnesses. It was incapable of test or disproof, save by the

contemporaneous conduct of the witnesses. Such conduct of the witnesses was glaringly contradictory to their testimony. The magnitude of the verdict is equalled only by the tenuity of the evidence.

We hold that the damages, if any, which accrued against the defendant were those only which arose proximately out of the injury to the plant by the flooding of the cellar, whether such injury was temporary or permanent; that there was no separate and divisible injury to the right of redemption, as distinguished from the injury to the property and to the ownership thereof and to the right of possession; that the damages claimed for alleged interference with the contract with Schaper, and the resulting loss of the property through the failure to redeem, were remote and speculative, and not proximate. These conclusions have the support of the following additional authorities: *Dubuque W. & C. Association v. City & County of Dubuque,* 30 Iowa 176; *Georgia v. Kepford,* 45 Iowa 48, 50; *Harrison v. Berkley,* (S. C.) 47 Am. Dec. 578; *Alabama Power Co. v. Keystone Lime Co.,* (Ala.) 67 So. 833, 836; *Brink v. Wabash R. Co.,* 160 Mo. 93; *Gregory v. Brooks,* 35 Conn. 437, 446; *Byrd v. English,* 117 Ga. 191, 192; *Sawyer v. Commonwealth,* (Mass.) 59 L. R. A. 726, 727.

It follows from these conclusions that the trial court should have directed a verdict for the defendant. The judgment below is accordingly—*Reversed.*

All the justices concur.